William **WATERS et al.,**
**Plaintiffs-Appellants,**

v.

**FURNCO CONSTRUCTION
CORPORATION,**
**Defendant-Appellee.**

**No. 75-1347.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1975.

Decided March 8, 1977.

Rehearing and Rehearing En Banc
Denied June 8, 1977.

Judson H. Miner, Chicago, Ill., for plaintiffs-appellants.

Joel H. Kaplan, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and CHRISTENSEN, Senior District Judge.*

FAIRCHILD, Chief Judge.

Plaintiffs are eight black bricklayers who allegedly sought employment on a firebrick job, relining a blast furnace, performed by defendant Furnco. Furnco declined to consider applications, following its policy, but hired principally from an existing list containing names of white bricklayers, supplementing the list by names of a few black bricklayers, obtained from other sources. The principal issue is whether, because of the denial of access to the employment process, plaintiffs proved a cause of action under 42 U.S.C. § 1981 or Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

Plaintiffs appeal from a judgment for defendant, entered upon adverse findings after a bench trial.

I

Furnco is a mason contractor, doing business over a large area of the country. In August, 1971 it contracted with Interlake Steel Corporation to reline with firebrick a blast furnace and related facilities in Chicago.

Furnco selected Joseph Dacies as brick superintendent for the Interlake job. Bricklayers were not hired at the gate, nor were applications taken from those who came to the gate. Instead, in accordance with past practice, Dacies was expected to hire bricklayers in whom he had confidence, and he had a list of bricklayers with whom he had worked on previous jobs. The bricklayers whose names he had from this source were all white, although he had occasionally worked with black bricklayers.

Because of past charges of discrimination on jobs in Cook County, Illinois, Furnco had decided to have "a minimum, if at all possible, of 16 per cent of the bricklaying force black." It applies this policy in Cook County only. Mr. Wright, general manager of Furnco, directed Dacies to follow this policy, and Dacies obtained names of black bricklayers by inquiry of other superintendents, and the like.

Dacies hired his first bricklayer on August 26, 1971. Several plaintiffs had been at the job site before that. He hired the second August 27, the third September 7, and the fourth September 8. All were white. The first black bricklayer was hired

* Senior District Judge A. Sherman Christensen of the District of Utah is sitting by designation.

September 9. Of the next eight bricklayers, hired by September 13, one was black. Of the next seven, hired by September 17, one was black. Of the next seventeen, hired by September 23, one was black. Up to October 10, 41 had been hired, four of whom were black.

Laying firebrick on this type of job is considered lucrative, and the earlier a bricklayer was hired, the longer he had an opportunity to work. The first hired worked 76 days. The first black person hired worked 56 days. A bricklayer hired September 27 worked 38 days.

Prior to, and during the early part of the Interlake job, Furnco was engaged in settlement negotiations with black bricklayers concerning claims of discrimination on an earlier job.[1] When these negotiations broke off in late September, Wright suggested to Dacies that he consider hiring those who were plaintiffs in the earlier case. On October 12 to 18, Dacies hired six of them, the only bricklayers hired from September 25 to October 21. Of these six, Hawkins, Smith, Pearson, and Williams are present plaintiffs. Smith, conceded by all to be qualified, worked a total of 20 days, Wilson 9, Williams 12, and the other three, Hawkins, Pearson, and Pendarvis were fired in two or three days.

Since the situations of the plaintiffs vary, we consider them as follows:

■ 1. *Gilmore.* Plaintiff Gilmore had never worked in firebrick. He testified that he went to the Interlake job site the last week in August. His testimony was markedly inconsistent with his answers on deposition and in interrogatories. The court evidently did not believe his testimony, or the testimony of others who said they saw him at the job site. The court found no credible evidence that he attempted to apply for work on the Interlake job. The question is one of credibility, it is difficult to understand the variation in testimony, and we do not consider the finding clearly erroneous. Thus judgment against Gilmore is to be affirmed.

2. *Williams.* Plaintiff Williams was one of the plaintiffs in the earlier case whose names were referred to Dacies by Wright. Dacies hired him at Interlake October 18, and he worked 12 days, until October 29. He testified he had gone to the job site in the latter part of August. As with Gilmore, other answers were grossly inconsistent. The court did not believe he attempted to apply at the job site, and we do not consider the finding clearly erroneous.

3. *Waters.* Plaintiff Waters wrote a letter to Wright in August, inquiring about work at Interlake. Wright passed his name to Dacies, for consideration. The district court found: "Dacies informed Wright that he had previously fired Waters on a job for insubordination and that he would not consider hiring him. There is no evidence whatsoever that Dacies has ever hired a bricklayer, white or Negro, who he had previously fired for insubordination or that his stated reasons for not considering Waters for employment were pretextual or designed to cover up a racially discriminating decision."

The parties agree that Waters and Dacies worked on a job in 1962. The bricklayers heard that another contractor on the same job was using laborers to do bricklayers' work, and Waters went to the other work area to investigate on two occasions. Dacies discharged him for leaving his work area, and when Waters refused to leave the premises, he was arrested and taken away. There is a dispute whether Waters left his work only during his lunch hour or whether he had left on a number of occasions and had been warned. The court's finding is not clearly erroneous.

■ The district court declined to allow plaintiffs' counsel to inquire about the disposition of the criminal charges brought against Waters. There was no offer of proof, although the record does suggest the charges were dismissed. The issue before the court was Dacies' true motivation at the time of the discharge and in later treating it as a reason for not hiring Waters. The

---

1. See *Batiste v. Furnco Construction Corp.*, 503 F.2d 447 (7th Cir. 1974).

merits or disposition of the criminal charge seem remote. In the absence of an offer of proof, demonstrating relevance, it was not an abuse of discretion to exclude further inquiry.

4. *Hawkins and Pearson.* Plaintiffs Hawkins and Pearson were among the group of black bricklayers whose names were referred to Dacies by Wright after the breakdown of negotiations with respect to a different dispute. Hawkins was hired October 12 and discharged October 13 at the same time as Gibertini, a white bricklayer. Pearson was hired October 13 and discharged October 15, the same day as Pendarvis, a black bricklayer who is not a plaintiff. The district court made findings as to poor workmanship which caused the discharges, and found there was no evidence that they were discriminatory or retaliatory. The findings are not clearly erroneous.

5. *Samuels, Nemhard, and Smith.* The district court found that Samuels, Nemhard, and Smith, as well as Waters, Hawkins, and Pearson, attempted to secure employment on the Interlake project by appearing at the job site gate. In addition, Nemhard as well as Waters, made written application. Except for Waters, as already recounted, and Smith, these attempts to apply did not bring about any consideration by Furnco, because of its policy. Smith was told by Dacies that Dacies would call him, and defendant concedes Smith's qualifications. Dacies did not, however, employ Smith until October 12, among the group of six black bricklayers employed from October 12 to 18, after the breakdown of settlement negotiations in the *Batiste* case.

Smith, hired as late as he was, had the opportunity to work only 20 days. Samuels and Nemhard were never hired. As already stated, Smith's qualifications were conceded. Samuels had 17 years experience as a bricklayer, and had been employed by several firebrick contractors, including Furnco on an earlier job. Nemhard had 29 years as a bricklayer, and had experience with firebrick on a job lasting about a year and a half.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court noted the complainant's burden in a Title VII case of establishing a *prima facie* case: "This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

These plaintiffs belong to a racial minority; they did all they could to apply, and were qualified for the jobs which were about to be open; they were refused consideration (although not permanently in Smith's case), and thereafter the employer sought out and employed persons of similar qualifications.

Defendant poses two defenses. One is that a white person of similar qualifications, but not on Dacies' list, would have achieved no better a result. The other is that the importance of selecting people whose capability had been demonstrated to defendant's brick superintendent is a "legitimate, nondiscriminatory reason" for defendant's refusal to consider plaintiffs. Although the district court agreed, we do not. The district court set forth the importance to defendant of hiring bricklayers with firebrick experience who could perform the work competently and expeditiously. The court further pointed to the disadvantages of hiring "at the gate," the difficulty of evaluating qualifications of persons appearing at the gate and avoiding discrimination, and the "chaotic" procedure involved in hiring "at the gate."

It seems to us that there is a reasonable middle ground between immediate hiring decisions on the spot and seeking out employees from among those known to the superintendent. A written application could be taken, with inquiry as to qualifications and experience. The applicant's claims could be checked and evaluated, and compared with the qualifications and expe-

rience of those on the list. The district court seems to have given no consideration to the feasibility of such a method, and we perceive nothing in the record to show that it would not be feasible. The method used, relying on recollections of the brick superintendent and recommendations he accepted from others, was by its nature haphazard, arbitrary, and subjective. "Such unstandardized and subjective procedures lend themselves to arbitrary and discriminatory hiring." *Reed v. Arlington Hotel Company, Inc.,* 476 F.2d 721, 724 (8th Cir. 1973).

■ Defendant asserts that its method is not racially discriminatory because a white bricklayer, appearing at the job site in search of work, would fare no better than plaintiffs. The record does not show that white bricklayers did in fact seek work in the same manner as plaintiffs. In any event, the seeming equality of treatment is deceptive. The historical inequality of treatment of black workers seems to us to establish that it is *prima facie* racial discrimination to refuse to consider the qualifications of a black job seeker before hiring from an approved list containing only the names of white bricklayers. How else will qualified black applicants be able to overcome the racial imbalance in a particular craft, itself the result of past discrimination?

In *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court dealt with the use of testing devices in deciding whether to employ or to promote. The Court held, "The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." P. 431, 91 S.Ct. p. 853. Devices and mechanisms must not be given "controlling force unless they are demonstrably a reasonable measure of job performance." P. 436, 91 S.Ct. p. 856.

As we understand the *Griggs* principle, it provides a method for establishing the presence of discrimination where application of a test to a group of employees or applicants results in a proportionally higher rate of

rejection of members of a minority group. Here the reliance upon the superintendent's recollection of bricklayers he considered competent was not a test or device for comparing the members of a group of prospective employees, for there was no defined group. Defendant appears to be treating its reliance on the list as such a device, and the entire body of bricklayers in the area as the group under consideration. Defendant seems to be turning the *Griggs* principle around, and making it establish absence of discrimination because the group employed by it has a higher percentage of minority members than does the entire relevant labor force. Where the percentage of minority members in a workforce is lower than the group considered, that fact may well indicate the operation of racial discrimination. Absence of such discrimination is not proved by the percentage in the workforce being higher than the percentage in the group considered.

■ Four out of the first 44 bricklayers hired, or almost 10%, were black. Eleven out of the total of 55, or 20%, were black. Out of the total of 1819 man-days worked on the job, 242, or 13.3%, were worked by black bricklayers. Although disputed, the court found that 5.7% of the bricklayers in the relevant labor force were minority group members. Seemingly, defendant contends these figures demonstrate that its method of selection did not discriminate on the basis of race.

We do not agree. Although black bricklayers would fill a fraction of the jobs (approximately 13–16%), these were people who in some manner came to Dacies' attention. Plaintiff Samuels and Nemhard had no chance at those jobs. White bricklayers also tended to be employed earlier and therefore obtained the longer lasting and more profitable jobs. Most of the jobs (approximately 84–87%) were foreordained to be filled by white bricklayers. At all times, these were to be filled from Dacies' list, naming only white bricklayers. This was not a case, like *Griggs*, of comparing white and black applicants by objective, but irrelevant standards, and rejecting more blacks,

proportionally, than whites. The qualifications of Samuels and Nemhard were never compared with either the black bricklayers who filled the small portion of the jobs, nor the white bricklayers who filled the great majority of the jobs. Consideration of Smith was delayed. Vis-à-vis the black bricklayers employed, plaintiffs could not claim that their rejection was based on race, but vis-à-vis the white bricklayers employed in 84–87% of the jobs, racial discrimination is established under the principle of *McDonnell Douglas.*

As to plaintiffs Samuel, Nemhard, and Smith, the judgment must be reversed.

## II

In finding that 5.7% of the bricklayers in the relevant labor force are members of minority groups, the district court relied on statistics in "The Chicago Plan," 41 C.F.R. § 60–11, a regulation issued by the Office of Federal Contract Compliance, U.S. Department of Labor, to implement E.O. No. 11446, 5 U.S.C. § 7342. The statistics were compiled during a hearing in 1969, and reflect, at least as estimates, the labor market in Cook County and five nearby counties.

Plaintiff sought to introduce testimony by the president of Local 21 of the Bricklayers' Union concerning the racial composition of the Local, the jurisdiction of which is Cook County. The study was made in 1973, and, according to an offer of proof, would have shown that out of a total membership of 3,800, between 510 and 530 were identified as black. The events at issue occurred in 1971. The district court refused to hear the testimony.

If the percentage of black bricklayers in the local labor force is relevant at all, we think it was an abuse of discretion to reject the offered testimony as irrelevant. Arguably a count of the Union in 1973 is as helpful in deciding what the proportion was in 1971 as estimates made in 1969. Arguably, also, the percentage in the Union covering Cook County is more appropriate for consideration than the percentage in the six-county area.

 In dealing with the merits, however, we have not relied on the racial proportions in the labor force. In any event, the offered 1973 Union figures indicate a percentage of 13.7 black bricklayers, and in view of the fact that 13.3% of the man-days worked on the job were worked by black bricklayers, the fact that Furnco set a goal of 16% black bricklayers, and the fact that 20% of the individuals hired were black, the error in excluding the Union figures would not be prejudicial.

Insofar as judgment was awarded against plaintiffs Samuels, Nemhard, and Smith, it is reversed and the cause remanded for further proceedings consistent with this opinion. In all other respects the judgment is affirmed. Costs on appeal are allowed to plaintiffs.