**Danny L. HARRIS, Plaintiff,**

v.

**RALSTON PURINA CO., Defendant.**

**Civ. A. No. 77–K–762.**

United States District Court,
D. Colorado.

June 6, 1979.

Gary M. Jackson, DiManna, Eklund, Ciancio & Jackson, Denver, Colo., for plaintiff.

Richard A. Winkel, Denver, Colo., Glenn L. Dalton, Ralston Purina Co., St. Louis, Mo., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND JUDGMENT

KANE, District Judge.

Jurisdiction of this court is invoked on behalf of the plaintiff pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* (Supp. 2, 1972) (hereinafter Title VII), and 42 U.S.C. § 1981. The defendant has admitted jurisdiction and the court finds that it has jurisdiction.

The plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964 as amended and § 1981. The plaintiff claims that he has been subjected to racial discrimination in that he was unlawfully discharged because of his race. The defendant denies such charge of discrimination and asserts that plaintiff was discharged because of the unauthorized taking of money from vending machines in the lunchroom on company property. Defendant asserts that the discharge was effected as a result of an investigation in which approximately 13 employees were interviewed. This investigation produced three written signed statements from hourly employees that positively identified the plaintiff and another employee as individuals who removed money from a vending machine.

The following facts are uncontroverted:

1. Plaintiff was employed by defendant at defendant's facility located at 4555 York Street, Denver, Colorado. Defendant admits that within 180 days of plaintiff's termination, charges of discrimination were filed with the Colorado Civil Rights Commission by plaintiff.

2. Defendant is an employer within the meaning of 42 U.S.C. §§ 2000e, 2000e(b), (g), and (h), in that defendant is engaged in an industry affecting commerce and employs at least 15 persons.

3. Plaintiff is a black American citizen who resides in Denver, Colorado.

4. Plaintiff was employed by Ralston Purina Company from June 26, 1973 to December 4, 1975.

5. Jerry Faulk, the personnel manager at the Denver plant, investigated and recommended the discharge of plaintiff from his position as a carton packer. The recommendation was approved by Clem Mulder, the plant manager, and forwarded to George Busha, production manager of Ralston Purina, at his office in Davenport, Iowa. Final approval of the discharge was made by Donald W. Rupprecht, Assistant Director of Labor Relations, Checkerboard Square Plaza, St. Louis, Missouri.

6. The unauthorized taking of money from vending machines in a lunchroom on company property was the reason for plaintiff's discharge from the Ralston Purina Company.

7. Jerry Faulk, the personnel manager, was the only management official who interviewed the three Ralston Purina employees who gave written statements accusing plaintiff and another employee of taking money from the candy machines in the mill lunchroom.

8. The Ralston Purina Company did not report this alleged theft to the police, nor was an offense report filed with the police department resulting from this incident.

9. Plaintiff was never charged, arrested or convicted of theft resulting from this incident.

10. The number of employees at the Denver Ralston Purina Company plant between the period of June 26, 1973 and December 4, 1975 who were discharged was 93.

11. The number of employees at the Denver Ralston Purina plant between the period of June 26, 1973 and December 4, 1975 who were suspended was 276.

12. The number of employees at the Denver Ralston Purina plant between June 26, 1973 and December 4, 1975 who were demoted was zero.

13. The number of employees at the Denver Ralston Purina plant between the period of June 26, 1973 and December 4, 1975 who were given written warnings was 1,283.

14. The percentage and number of black employees during the period of June 26, 1973 and December 4, 1975 who were discharged was 22.8 per cent or 21 in total number.

15. The percentage and number of black employees during the period of June 26, 1973 and December 4, 1975 who were demoted was zero.

16. The percentage and number of black employees during the period of June 26, 1973 and December 4, 1975 who were given a written warning is 10.8 per cent or 138 in total number.

17. Between June 16, 1973 and December 14, 1975 five other employees of the Ralston Purina Company were discharged where the sole reason or a factor thereof was stealing.

18. Between the period of June 26, 1973 and December 4, 1975, no employee was suspended from the Denver office of the Ralston Purina Company for stealing. All employees accused of stealing were discharged.

19. There was no specific policy of the Ralston Purina Company of Denver regarding a specified number of written warnings, demotions, or suspensions allowed by the Ralston Purina Company before the dismissal of an employee would be required prior to December 4, 1975.

20. As of December 24, 1975, the number of Ralston Purina employees who have the position of foreman, supervisor, and superintendent, and the percentage that was black of these positions was as follows:

| | | |
|---|---|---|
| Foreman: | 18–0 | black |
| Supervisors: | 12–1 | black |
| Superintendent: | 1–0 | black |

21. Foremen and supervisors, subject to the plant manager's approval, have the authority to recommend discharge, suspend, demote, or issue a written warning to a carton packer.

22. John Williams, Harvey Sharpley, and Randy Payne, were foremen or supervisors at the Denver plant during the period June 26, 1973 to December 4, 1975.

23. Between June 26, 1973 and December 4, 1975 14 people held the position of carton packer with the Denver branch of the Ralston Purina Company. Of these 14, 1 was black. Of these 14 employees, 4 were promoted to another position. Of the four employees promoted, none of those promoted were black. "Promotions," as described in this section, are made on the basis of bids which are awarded in accordance with the bidding procedure outlined in the Employee Relations Manual.

From the contested evidence, that is the testimony of the witnesses and the exhibits introduced at trial the court finds the following facts based upon a preponderance of evidence:

On November 25, 1975 in the mill lunchroom of defendant's facility at 4555 York Street, Denver, Colorado, a candy vending machine was broken as a result of an employee hitting it because of its failure to function properly. Upon the breaking of the candy vending machine different people approached it taking candy bars and/or money from the machine. The incident occurred between approximately 8:30 and 9:30 p. m. during a break on the second shift.

At approximately 11:00 p. m. on November 25, 1975 the plant personnel manager, Jerry Faulk, was advised of the incident. As personnel manager Faulk was responsible for the investigation of such matters. When the employees on the second shift returned to work at approximately 3:00 p. m. on the next day, Faulk commenced his investigation. Faulk interviewed Bud Kemp, an employee who had initially reported the matter to his supervisor and thereafter interviewed approximately 13 employees. The group interviewed included two black employees, two Spanish American employees, one oriental employee and eight white employees.

During his investigation Faulk was advised by three employees that they had personally witnessed the plaintiff and one other employee, Mike Duran, remove money from the candy machine. These employees stated that although other employees approached the machine during the incident, they could only state with certainty that Harris and Duran had removed money at that time.

Faulk also determined that Kirk Sleeth had removed a candy bar from the machine. Sleeth admitted removing the candy bar and affirmatively advised Faulk that just a few minutes before he had deposited 15 cents in the machine to obtain a candy bar, but because of malfunction he did not receive the candy bar. Therefore, when the machine was opened he approached it, removed the candy bar which he had previously purchased, returned to his luncheon

table, held up the candy bar and stated, "At least I got my candy bar." Sleeth's explanation was verified by several other employees sitting at the same lunch table.

Employee Kemp advised that he had witnessed Danny Harris and Mike Duran take money from the candy machine. Kemp also stated that although he saw Manuel Manzannares at the machine, apparently with something in his hand, he could not state with certainty what Manzannares had or whether it had been removed from the machine. Kemp also advised Faulk of the names of other employees who could verify his statements. Employee Tom West advised that he had seen Mike Duran bump the machine in an effort to dislodge a coin and that the door came open. He saw both the plaintiff Harris and Duran take money from the candy machine. He indicated that although Sleeth, employees Delbert Bishop and Manuel Manzannares were around the machine at the time he could not identify any of these with certainty as having taken money or food products from the machine.

Employee Don Weber advised Faulk that he had seen the machine door open and the coin box removed. Weber stated that he had witnessed Mike Duran and another employee remove money from the machine. He described Harris to Faulk without knowing Harris' name. He demonstrated for Faulk the motions of the two individuals as one poured a handful of change from one hand to another and the other jingled bulging pockets of loose change while standing close by. He indicated that there were other employees at the candy machine but he could not state for certain whether these other individuals had taken either money or food products. He did state that Kirk Sleeth had removed one candy bar because he had lost his money in the machine a few minutes earlier. Faulk then interviewed Mike Duran. Duran was asked whether he knew anything about the incident involving the vending machine. Duran stated that he didn't see anyone take anything and that he knew nothing about it. He told Faulk this could be verified by John Suppes. Faulk then spoke to Suppes, who stated he was not on break at the same

time as Duran because he had gone on break later. Suppes stated that he was not there when the incident had happened but had heard about it. Faulk then talked to Suppes and Duran's supervisor who verified that the two did not go on break at the same time. Continuing his investigation Faulk interviewed Kirk Sleeth. Sleeth confirmed the reports about his losing 15 cents in the machine and walking away and shortly thereafter noticing the door to the candy machine being opened, he had returned to the machine to obtain his candy bar.

Faulk then spoke to plaintiff Danny Harris. He informed Harris that he was investigating the incident involving the candy machine which occurred the previous night and asked him if he was there and, if so, whether he knew anything about what had happened. Harris stated that he didn't go on break, that he didn't see anything, and didn't know anything about what had happened. Faulk then stated there were other employees that had indicated he was in the lunchroom at that time, but Harris continued to maintain that he was not there.

Faulk then interviewed Bill Burkes who advised that he knew nothing about the incident and would rather not say what he saw. Burkes did, however, advise that Tom Gent was in the lunchroom at the time. Faulk then interviewed Gent who stated that he did not see anything happen.

Faulk's next interview was with Manuel Manzannares. Manzannares told Faulk that he didn't remember being on break at the time and he knew nothing about the breaking and entering of the candy machine. Faulk then interviewed Delbert Bishop. Bishop acknowledged that he was present when the candy machine was entered by employees. He told Faulk that he approached the machine and came very close to removing property. Bishop stated, however, that on second thought he decided not to jeopardize his employment at Ralston Purina Company and therefore decided not to participate in the removal of candy or money from the machine. Bishop refused

to name any names or say any more about the incident other than relating his own temptation and resistance thereto. Faulk then attempted to interview Sam Ceridon and Steve Smith. Ceridon advised that he saw nothing, knew nothing, and would say nothing. Smith advised that he had his back to the machine and could not testify to anything.

Faulk was further advised that two additional employees, Dwight Grant or Arnold Willman, might have been in the lunchroom at the time of the incident but there was considerable doubt about their presence and thus Faulk determined that it would not be productive to interview these two employees. Faulk's investigation covered approximately 10 to 11 hours. He interviewed all of the employees whose presence was definitely established in the lunchroom at the time of the incident and had notice of only two other possibilities which to him seemed remote and thus did not warrant further investigation. Upon completion of the interviews Faulk consulted with the plant Manager, Clem Mulder, and Don Rupprecht, labor counsel. Rupprecht advised that the company policy provided for immediate termination for stealing. No exceptions were discussed. Rupprecht then directed Faulk to obtain written statements from the three employees who had witnessed Harris and Duran remove money from the candy machine and further advised him to contact the vending machine company to establish definitely that money and food products had been taken and to determine the amounts that were missing.

The concensus of Faulk, Mulder and Rupprecht was that the theft by Harris and Duran was firmly established. However, all three felt that because no other employees could be positively identified as having removed money or candy from the machine, only Harris and Duran should be terminated. The other employees' involvement as related by Faulk's investigation was based upon opinion or speculation with the exception of the activities of Sleeth. Having established clearly that Sleeth had taken only what he had purchased, he was thus exonerated. Before receiving any notice of

termination, Faulk, pursuant to directions, provided both Duran and Harris with an additional opportunity to offer any explanation or relate any mitigating circumstances. Neither Duran nor Harris availed themselves of such opportunity and both were separated on December 5, 1975.

The uncontradicted testimony by Faulk and Mulder established that Faulk's investigation and the processes undertaken by management in its deliberation on this matter were carried out in accordance with normal procedures utilized by the company and that the penalties enforced were those established in accordance with regular disciplinary policies.

Plaintiff contends that he was the victim of disparate treatment in the investigation and discharge. Yet the evidence does not support this contention. Both employees who were found to have violated the established company rule requiring discharge for theft were fired. No other employees were found to have violated this policy. It may well be that had the company chose to apply a less exacting standard of proof before imposing discipline others may have been subject to some sort of action for complicity, but under any standard of proof the application of the policy would call for the discharge of both Harris and Duran. The investigation was indeed thorough and significantly exceeded minimal standards of fundamental fairness. Harris, as well as the other suspected employees, was given ample opportunity to be heard; that he was not believed in the face of significant evidence to the contrary does not raise an inference of racially motivated disparate treatment.

In reaching this decision I have considered *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Higgins v. Gates Rubber Co.*, 578 F.2d 281 (10th Cir.) and *Furnco Cons't Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957. In view of the nature of the discharge and the clear showing that no employee found guilty of theft ever received less of a penalty than discharge, I do

not find the other statistical information to be persuasive or enlightening.

Because of the foregoing reasons it is

ORDERED that the complaint herein is dismissed, defendant shall have judgment for its costs herein expended. Neither party shall be awarded attorney fees.