William WATERS, Sylvester Williams,
Willie G. Pearson, Vandy Hawkins, Cur-
tis Gilmore, Donald Samuels, Robert
Nemhard, and William Smith, Plaintiffs-
Appellants,

v.

FURNCO CONSTRUCTION
CORPORATION,
Defendant-Appellee.

No. 75–1347.

United States Court of Appeals,
Seventh Circuit.

Decided Sept. 2, 1982.

Judson H. Miner, Chicago, Ill., Jack
Greenberg, New York City, for plaintiffs-
appellants.

Joel H. Kaplan, Chicago, Ill., for defend-
ant-appellee.

Before PELL, Circuit Judge, FAIR-
CHILD, Senior Circuit Judge, and CHRIS-
TENSEN,* Senior District Judge.

FAIRCHILD, Senior Circuit Judge.

In our earlier decision, 551 F.2d 1085, we
affirmed the judgment against five of the
eight plaintiffs. As to the other three,
Nemhard, Samuels, and Smith, we held that
they had each made out a *prima facie* case
of disparate treatment under *McDonnell
Douglas Corp. v. Green*, 411 U.S. 792, 93
S.Ct. 1817, 36 L.Ed.2d 668 (1973).

The district court had made findings that
Furnco had a critical need to insure that
only experienced and highly qualified fire-
bricklayers were employed on this job; that
in order to do so its job superintendent,
Dacies, endeavored to hire only firebricklay-
ers with whom he had previously worked in
blast furnace relines or who were recom-
mended as being skilled in such work; that
a number of factors precluded Furnco from

---

* Senior District Judge A. Sherman Christensen   of the District of Utah sitting by designation.

hiring bricklayers not known by Dacies to be experienced and highly qualified in firebrick; that hiring of firebricklayers is not done at the gate for a number of reasons; that these policies and practices were justified as a business necessity; and that there was no evidence that these policies and practices were a pretext to exclude Negro bricklayers.

In our earlier decision, we concluded that a different method of application and selection could meet Furnco's needs without excluding qualified individuals from consideration.

The Supreme Court determined that we had gone too far in requiring a method which allows the employer to consider the qualifications of the largest number of minority applicants, and reversed and remanded for further proceedings. *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

We called for and received briefs from the parties.

■ The *prima facie* case of Nemhard and Samuels rests exclusively upon the fact that Furnco refused to consider their attempted applications. It is clear that Furnco has satisfied its burden "by producing evidence that the plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The reason, in essence, was the need to obtain workers known from experience to be sufficiently qualified. The district court had found there was no evidence that the reason was pretextual. On this record the finding is not clearly erroneous.

We have considered plaintiffs' argument that the "primary" use by Dacies of his discriminatory "list," hereafter referred to, rendered Furnco's reason for refusing to consider unknown applicants pretextual. Particularly in the light of the substantial number of black bricklayers hired on the job at the specific direction of Furnco management, we think the argument does not have merit.

Accordingly, we conclude that the judgment against Nemhard and Samuels must be affirmed.

The case of plaintiff Smith has, however, an additional and significant element, not specifically resolved by the findings and conclusions of the district court.

■ Smith had worked for or with Dacies before, in 1958, 1962, 1969, and 1971. His work evidently met Dacies' standards. Dacies testified that on one occasion, the date of which he did not remember, but in the course of the Interlake job, he met Smith at the gate area and had a conversation. In one answer, he testified: "I said, 'What are you doing here? You are going to get a job when I'm ready to increase the forces.' I was very much surprised that he was out there, and that was the course of the conversation and then eventually I did hire him, because I knew him." In a later answer, he testified: "I talked to him and I said, 'You can go . . . might as well go home, Smitty. I will call you when the job is ready, when I am ready to hire people." The difference between the two versions is that the second may suggest the conversation occurred before any people were hired and the first, that it occurred after some had been hired.

Smith fulfilled the specification of being known to Dacies to be experienced and highly qualified in firebrick. Yet he was not hired as soon as he sought employment, and not until very late in the job.

On direct examination by Furnco's counsel, Dacies testified, in part:

"Q. Would you tell us the primary way that you would hire bricklayers?

"A. Well, I have a list of bricklayers. There are various notes, I don't have a direct file system, but it is people, prior to even working with Furnco, I had worked with bricklayers all over the country, and in this area. I have kept their telephone numbers, because they were good mechanics. So when I have a job, I try to contact them. I also try to contact other superintendents in the area to see what manpower is available. Sometimes there

is another job going on. There may be some people working on that job that I want and cannot get.

"Q. The primary way, though, you said, is through these people you have known for a long period of time?

"A. Right.

\* \* \* \* \* \*

"Q. Calling your attention again, prior to the time the first bricklayer was hired on the Interlake job, did you have any conversation with Mr. John Wright regarding the hiring of black bricklayers on the job?

"A. Yes, I did.

"Q. Would you tell us about that?

"A. He said he would like to have black people on the job. He didn't say who specifically or anything. He said, 'I know some black bricklayers, I'd like to have them on.' I said, 'I'll try. I'll have to contact Mr. Urbanski or somebody I know that has names and who might be qualified to work on blast furnace work,' because Al Urbanski had been working this area quite a while. I traveled out in the area quite a bit.

"Q. Now, did Mr. Wright indicate to you any kind of quota that he wanted?

"A. Well, he said at least 16 per cent. He didn't put no maximum. He said, 'See if you can get at least 16 per cent'

"Q. Now, did you know the names of any black bricklayers?

"A. I knew a couple that was at South Works, but I didn't have their addresses or telephone numbers. I had to go through Urbanski to get telephone numbers to hire blacks."

It is clear that no black bricklayers were included on what Dacies considered his "list." Thus Smith, who met the objective qualifications to be on it, was not, and because no blacks were on it, the inference can be drawn that he was excluded because of his race.[1]

Smith testified that Urbanski, superintendent on another Furnco job, had told him that the Interlake job would start in August and suggested that Smith go by there. Smith did go before the job started and two or three times a week thereafter. He talked with Dacies about seven or eight times. At some time, approximately September 20, Dacies called him to come to work. He did so, but because of some problem, which Smith does not dispute, Dacies said he was not adding any bricklayers. Assuming this was the fact, Smith's estimate of September 20 was too early. He must have reported at least as late as September 27, when the number of bricklayers first reached 39, the number having increased from 18 on September 20, and 22 on September 21.

Although Smith can be said to have applied at the gate, he was not an unknown. He was objectively entitled to consideration as a person known by Dacies as an experienced and highly qualified firebricklayer. He did not receive consideration until much later because Dacies' "primary" source was his list, which inferentially was racially discriminatory. Furnco concedes that Furnco is responsible for Dacies' conduct on the Interlake job.

Furnco tells us in its brief that "the evidence plainly shows . . . that the date of [Smith's] hiring on the Interlake job was not the product of racial discrimination, but was the product of a random and nondiscriminatory sequence of selection." We find no such plain evidence, nor any evidence that when Smith appeared at the gate and made known to Dacies his desire to work he was rejected, or his hiring postponed, for a legitimate, nondiscriminatory reason. In any event, the district court, though finding that Smith had worked for Dacies and that Dacies told Smith of his intent to contact him, did not address the theory of Smith's case, just outlined.

Accordingly, we reverse as to Smith, and remand for further proceedings. Judge Austin having died, the case will necessarily

---

1. The assertion in plaintiffs' brief that Samuels also worked with Dacies (at South Works in 1969) is not supported by the record. (Note the reference to plaintiffs' claim as to Samuels in *Furnco*, 438 U.S. at 581 n.9, 98 S.Ct. at 2952 n.9.)

come before a different district judge. We contemplate that the new judge will be free to hear further evidence as deemed necessary for resolution of the issues, posed as to Smith, relying on the transcript of testimony before Judge Austin so far as feasible.

Insofar as judgment was awarded against plaintiff Smith, it is reversed and the cause remanded for further proceedings consistent with this opinion. In all other respects the judgment is affirmed. Costs before the Supreme Court are to be recovered by defendant from plaintiffs Samuels, Nemhard, and Smith. The parties are to bear their own costs before this court.