### Isaac HAMMOND

v.

### RAPIDES PARISH SCHOOL BOARD.

Civ. A. No. 82–2327.

United States District Court,
W.D. Louisiana,
Alexandria Division.

July 23, 1984.

Louis Berry, P. Spencer Torry, Arthur Charles Lyons, I, Alexandria, La., for plaintiff.

Edwin O. Ware, Dist. Atty., Gus Voltz, Jr., Asst. Dist. Atty., Alexandria, La., for defendant.

NAUMAN S. SCOTT, District Judge.

Plaintiff, a black principal in the Rapides Parish, Louisiana school system, brings this action pursuant to 42 U.S.C. § 1981 and § 1983 for injunctive and monetary relief. He alleges that the Rapides Parish School Board has administered the teacher tenure laws, La.R.S. 17:441, *et seq.*, in a discriminatory fashion by demoting him from an elementary school principal to a classroom teacher at a reduced salary. As a result, he prays for monetary damages and other equitable relief. We have jurisdiction.

## FINDINGS OF FACT

1. Isaac Hammond is a black citizen formerly employed by the Rapides Parish School Board as the Principal of Lincoln Road Primary School (Grades K–3) from 1971 until September 1982. During this period, Mr. Hammond performed his duties satisfactorily and enjoyed a good reputation as an educator.

2. The Rapides Parish School Board is the administrative and governing body of the Parish school system. The Board is composed of six (6) white males, one (1) white female, and two (2) black males elected from districts within the parish. In addition, the Board has recently converted to a racially dual school system and currently operates under our desegregation order, *Valley v. Rapides Parish School Board,* 499 F.Supp. 490 (W.D.La.), *rev'd and remanded in part,* 646 F.2d 925 (5th Cir.1980), *opinion on rehearing,* 653 F.2d 941.

3. During the 1981–82 school year, the Rapides Parish School Board implemented a Pupil Progression Plan previously adopted by the Louisiana State Department of Education. This plan set forth the School Board's promotional policy. In part, it provided that students in Grades 1 thru 3 must pass the Rapides Parish Proficiency Test with seventy (70%) percent mastery in

order to be promoted. Section 11, Item 3, Para. (c) provides as follows:

"c. *Proficiency Testing*

The students must pass with 70% mastery the Rapides Parish Proficiency Test effective Grades 1 thru 3 in the 1980–81 school year and in Grades 4 thru 6 in the 1981–82 school year."

In addition, students were required to meet reading level criteria by seventy (70%) percent proficiency on the Harper Row Mastery Test. Other requirements were passing grades and attendance. The mastery test and the proficiency test are regarded as the most important criteria for promotion. (See Plaintiff's Exhibit II).

4. On September 22, 1981, Silverene Boss, Director of Elementary Education for Rapides Parish, sent a letter to all elementary school principals, including Mr. Hammond, which noted that a "pool of items" had been printed for the test. It urged principals to ensure that their students were drilled on these items in preparation for the test. She stated that "the Parish Proficiency Test *will be used as one of the criteria* of promotion for Grades 1 thru 6 during the 1981–82 school year." (Defendant's Exhibit 3, Memo # 81–440) (emphasis in original). She also directed the principals to send a letter to parents urging home instruction and attached a sample letter. It reads in pertinent part as follows:

"Dear Parent, The Rapides Parish Proficiency Test *will be administered to each student* in Grades 1 thru 6 during the Spring. A passing grade on this test will be mandatory for promotion of Grades 1 thru 6 . . . ."

(Defendant's Exhibit 3, Memo # 81–440, Attachment) (Emphasis added).

5. On December 1, 1981, Ms. Boss notified the elementary school principals that the parish test "will be administered to students in Grades 1 thru 6 during the first part of May 1982." Further, "all elementary students will be required to pass the proficiency test to be promoted." Ms. Boss enclosed an administrative manual, scoring key, and an answer sheet in her letter to assist in preparing the students for the test. (Defendant's Exhibit 3, Memo # 81–607).

6. On March 17, 1982, two additional memoranda were sent by Ms. Boss to elementary school principals. The first noted that the Parish had tentatively scheduled the administration of the proficiency test on May 11, 12 and possibly 13. (Defendant's Exhibit 3, Memo # 82–130). The second reminded the principals of the School Board's promotional policy, i.e., "students in Grades 1 thru 6 must pass the proficiency test" to be promoted. (Defendant's Exhibit 3, Memo # 82–131).

7. All memoranda sent by Ms. Boss were directly approved by Allen E. Nichols, Superintendent of Schools, and Eugene Millet, Assistant Superintendent, and operated as directives from the School Board. Workshop sessions for principals and teachers were also held to ensure understanding of the School Board's promotional policy. Mr. Hammond attended these meetings.

8. On May 12, 1982, the Parish Proficiency Exam was given to students at Lincoln Road Primary School. The tests were administered by special personnel without active participation by teachers or Mr. Hammond. However, several first grade students at Lincoln Road Primary did not take the examination that day, even though they were present at the school.

9. Paula Turnage, a first grade teacher, had five or six students removed from her class at Mr. Hammond's direction prior to the administration of the test. Shortly after the children came to Ms. Turnage's room, but before she called roll, Mr. Hammond appeared and instructed her to select those students from the class whom she felt could not pass the test. He further directed her to have her aide, Ms. Marcot, take them to the aide's room during the examination. Ms. Turnage followed Mr. Hammond's instructions and sent the children out of the room with Ms. Marcot. Later, Mr. Hammond appeared a second time and told her to mark those children whom she had selected as "absent", and to

tell Ms. Davis, the testor, that these children were not present. He stated that the school had a high average on the exam, and if these children (who may have been destined to fail) had taken the test, it would bring the school's average down. Ms. Turnage again followed Mr. Hammond's instructions and told Ms. Davis the children were absent. Ms. Davis later reported their absence after administering the test to the remaining children.

10. Michelle Pitka, another first grade teacher, had two students removed from her classroom by an aide, Barbara Dorsey, pursuant to Mr. Hammond's directions. Ms. Dorsey came to Ms. Pitka's classroom on the morning of the exam and told her Mr. Hammond *specifically* requested that two students, namely, Ramion Davis and Lloyd Allen, be absent when the test was given. Ms. Pitka did not question the instructions and complied. She later reported the incident to Ms. Cyrique, an assistant testor. The test was given to the remaining children in Ms. Pitka's class.

11. The students who did not take the exam on May 12 were given an opportunity to take a makeup test at the Rapides Parish Instructional Resources Center on May 20, 1982. Mr. Hammond sent notices of the makeup test to parents of the absent children, including those students whom Mr. Hammond prevented from taking the test. Parents were to furnish their own transportation except as noted. (Plaintiff's Exhibit 13). Only two of the excluded students actually took the makeup test. The others did not take the test.

12. In early June 1982, Ms. Pitka went to the School Board office seeking a contract extension. During her visit, she reported Mr. Hammond's conduct directly to Ms. Boss. Ms. Boss, though aware of the problem, decided to refer the matter to Mr. Millet. Ms. Pitka then told Mr. Millet about Mr. Hammond's behavior. Mr. Millet then relayed the allegations to Mr. Nichols, and he ordered an investigation.

13. During June and July, 1982, Mr. Millet, assisted by Richard Sasser, conducted interviews with witnesses and consulted Gus Voltz, an Assistant District Attorney, about the possibility of bringing formal charges against Mr. Hammond for violation of School Board policies.

14. On August 5, 1982, an informal meeting was held at Mr. Nichols' office concerning the allegations of misconduct against Mr. Hammond. Messrs. Nichols, Millet, Sasser and Hammond were present. Mr. Nichols confronted Mr. Hammond with the allegation that he purposely caused the removal of students from classrooms prior to the proficiency test. Mr. Nichols also questioned Mr. Hammond about whether he had used instructional funds to offset a lunchroom deficit. Mr. Hammond admitted misappropriating funds but strenuously denied intentionally removing students to avoid their testing.

15. On August 10, 1982, the Superintendent recommended that Mr. Hammond be dismissed as principal of Lincoln Road Primary School on charges of willful neglect of duty and incompetence. The charges were based on the alleged misappropriation of funds and the intentional removal of students prior to the proficiency exam. By letter dated August 11, 1982, Mr. Nichols informed Mr. Hammond of the charges against him. (Plaintiff's Exhibit 2).

16. On September 9, 1982, a public hearing was held before the School Board. It began at approximately 5:00 o'clock p.m. and continued through the early morning hours. Evidence was taken, and arguments were heard. Mr. Hammond vigorously denied he removed any students. At the same time, Mr. Hammond asserted that he interpreted Board policy not to require that every student be tested, but only those students who are promoted. It was argued that he gave the "absent" students the opportunity to make up the test and therefore ultimately complied with the policy on testing. Mr. Hammond expressed his belief that young children should not be tested, and the Board's policy on testing was wrong.

17. The charge of misappropriation of instructional funds was dismissed. How-

ever, by a vote of six (6) to three (3), the School Board found Mr. Hammond guilty of "incompetence and willful neglect of duty for the reason that he intentionally violated School Board policy by removing, or causing to be removed, several students from one or more classrooms so as to purposely avoid the parish proficiency testing of those pupils." The School Board thereupon suspended Mr. Hammond with pay until September 13, 1982, at which time the "permanent penalty will be fixed". (Plaintiff's Exhibit 2).

18. The Minutes of the Board meeting held on September 13, 1982, read in pertinent part as follows:

#### THE BOARD RECONVENED IN OPEN SESSION.

"A motion was made by Mr. Louis V. Crenshaw and seconded by Mr. Douglas A. Jenkins that the Rapides Parish School Board adopt a resolution as follows:

#### RESOLUTION

"We, the Rapides Parish School Board, have found Isaac Hammond guilty of incompetence and willful neglect of duty for the reasons that he intentionally violated School Board policy by removing, or causing to be removed, several students from one or more classrooms so as to purposefully avoid the parish proficiency testing of those pupils.

"Having thus found Isaac Hammond guilty as above stated, we do hereby remove him permanently as a principal in the Rapides Parish school system and order him placed as a classroom teacher in a proper position befitting his certification at a classroom teacher's salary schedule.

"We further resolve that this action is to be effective immediately this 13th day of September, 1982."

The resolution was adopted on a roll call vote as follows:

"AYE: Mr. Jenkins (white), Col. Duncan (white), Mrs. Kellogg (white), Mr. Crenshaw (white), Mr. Holloway (white), Mr. Farrar (white).
"NAY: Mr. Williams, Mr. Joffrion, Mr. Martin (white)."

(Plaintiff's Exhibit 2) (Emphasis added).

20. On September 14, 1982, Mr. Nichols advised Mr. Hammond that he was assigned as a teacher to Alexandria Junior High School effective September 14, 1982. Mr. Hammond presently holds that position.

21. On August 3, 1982, this Court ordered that Freddie Banks, a black citizen and former principal of Lincoln Williams Elementary School, be assigned by the Rapides Parish School Board to the "next available position which approximates his former assignment." *Freddie Banks v. Rapides Parish School Board*, CA 81–0032–A, Ruling on plaintiff's Motion for Summary Judgment (W.D.La., Aug. 3, 1982). Mr. Banks had been displaced by the closing of his school under our desegregation order, but had continued his employment by the Board in a staff capacity. *Valley, supra.* Equitable relief was necessary to restore Mr. Banks to his former position. In compliance with our order in that case, the School Board assigned Mr. Banks as principal of Lincoln Road Primary School. He presently holds that position.

22. On other occasions, the Superintendent has initiated investigations and/or disciplinary proceedings against six (6) white principals for alleged violations of School Board policy. Three (3) white principals accused of wrongdoing resigned following conference with the Superintendent rather than face formal charges and a hearing. Another white principal was charged and after a hearing was demoted by the Board to his original tenured position as an assistant principal of a high school. The record does not disclose the specific charges in each instance. Since the Hammond incident, two (2) white principals have been accused of malfeasance. Formal charges were brought against Charles Thigpen, Principal of Rapides Par-

ish High School, and an informal investigation of Jerry Gill, Principal of Martin Park Elementary School, was conducted as a result of administrative irregularities.

23. On March 2, 1983, following Mr. Hammond's demotion, Mr. Nichols recommended that Charles Thigpen be removed as principal because of willful neglect of duty and incompetence. Mr. Nichols alleged that Mr. Thigpen "has not only permitted, but directed a teacher under his supervision to violate School Board policy by copying copyrighted music." Mr. Thigpen admitted authorizing his music teacher to copy music. He also expressed an intent to continue the practice so long as no funds were available to purchase needed music. (Plaintiff's Exhibit 5). Mr. Thigpen waived his right to a public hearing and asked for a private hearing at the earliest possible date. A hearing was held on the charges, and the Board passed a motion by its President:

> "I move that in light of the admission of willful neglect of duty by failing to follow the directives of the School Board by Mr. Charles Thigpen and his proper attitude in correcting the situation, that a letter of reprimand be placed in his file. The letter should read that 'this is to officially notify Mr. Charles Thigpen of reprimand by the Rapides Parish School Board for failing to follow a directive of the Superintendent of Schools. Be it further understood that willful failure to comply with Board policy by Mr. Thigpen in the future would result in his immediate dismissal.' (Plaintiff's Exhibit 5)."

24. The incident involving Mr. Gill concerned whether a student, Tiffany Hayes, had been promoted without having taken the Harper Row Mastery Level Test. Tiffany Hayes, a first grade student at Martin Park, was promoted and transferred to Lincoln Road Primary. Mr. Hammond, the principal at Lincoln Road, discovered that Tiffany did not have any record in her file indicating that she took the mastery test. An investigation was conducted by the School Board office. The Board determined that Tiffany's teacher was responsible for the oversight. No charges were brought against Mr. Hill as a result of this incident.

25. There is no evidence that the School Board has brought any action against any black principal before or since the Hammond incident.

26. Since Mr. Hammond's demotion, the School Board appointed Mr. Thompson, a black citizen, as principal of Rosenthal Elementary School to replace Mr. Long, a white. In doing so, the School Board rejected white applicants on the basis of merit in favor of a black. See *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir.1969) *(en banc), rev'd in part on other grounds sub nom, Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1971).

## CONCLUSIONS OF LAW

It is well established that a claim of racial discrimination under § 1981 and § 1983 may be analyzed under the standards developed in Title VII actions. *Lee v. Russell County Bd. of Education*, 684 F.2d 769, 773 (11th Cir.1982); *McWilliams v. Escambia County School Bd.*, 658 F.2d 326, 331–32 (5th Cir.1981). In a Title VII action, the plaintiff bears the burden of establishing a prima facie case of unlawful discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving a prima facie case, the burden shifts to the defendant to "articulate some legitimate non-discriminatory reason for the employee's rejection". *McDonnell-Douglas Corp. v. Greene*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Finally, should the defendant meet this burden, the plaintiff must have an opportunity to prove by a preponderance of the evidence that the proffered explanation was not the true reason for the employment decision, but served as a pretext for discrimination. *Id.* U.S. at 804–805, 93 S.Ct. 1817, at 1825–1826, 36 L.Ed.2d 668.

With this framework in mind, we consider first whether the plaintiff established a prima facie case of racial discrimination.

The *McDonnell-Douglas* test, as modified for application in discharge cases, requires that the plaintiff prove: (1) he is a member of a protected class; (2) he was qualified for the position held; (3) he was discharged; and (4) he was replaced by a person outside of the protected class with lesser or equal qualifications. See, *Lee, supra*, at 773; *Jackson v. City of Killeen*, 654 F.2d 1181, 1183–84 (5th Cir.1981).

■ In this case, the plaintiff is a black citizen and a member of a protected class. Without question, Mr. Hammond was qualified for the position which he held and he was discharged. Although Mr. Hammond was replaced by a member of the same class with equal or lesser qualifications, this fact is not significant. As stated by the Supreme Court, the prima facie method "was never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Proof that the defendant failed to fill the vacant position with a non-minority is not necessary in all cases of alleged discrimination. *Jackson, supra.* In replacing the plaintiff, the School Board simply complied with our Judgment in *Freddie Banks v. Rapides Parish School Board, supra.* In this circumstance, we find that the plaintiff has established a prima facie case, even though he was replaced by a black citizen.

Having found that the plaintiff has established a *prima facie* case, a presumption arises that the defendant administered the teacher tenure laws in a discriminatory fashion. See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). As stated above, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the employee's demotion. In the usual Title VII action, the defendant's burden is not onerous. The defendant can rebut the presumption by submitting evidence *"sufficient* to raise a genuine issue of fact. *Id."* U.S. at 255 and n. 8, 101 S.Ct. 1089, at 1094 and n. 8, 67 L.Ed.2d 207. (emphasis added). However, in actions under § 1981 and § 1983 against school authorities with an immediate history of racial discrimination, the sufficiency of evidence required to rebut plaintiff's prima facie case may be greater.

In § 1981 and § 1983 cases decided prior to *Burdine*, the Fifth Circuit held that where the defendant has an immediate past history of racial discrimination, such as a school district operating under a Federal injunction ending a recent regime of *de jure* segregation, the defendant bears a burden of persuasion requiring proof of clear and convincing evidence. *Lee v. Conecuh County Bd. of Education*, 634 F.2d 959, 963 (5th Cir.1981); *Lee v. Washington County Bd. of Education*, 625 F.2d 1235, 1237 (5th Cir.1980). Accord, *Hardy v. Porter*, 613 F.2d 112, 113 (5th Cir.1980). Since *Burdine*, it is unclear whether this rule has been modified or altered by the clarification of the defendant's burden in a Title VII action. See, e.g., *McWilliams, supra*, at 331–32, fn. 2. In our view, the pre-*Burdine* cases cited above are erroneous insofar as they shift the burden of persuasion to the defendant once plaintiff has proven a prima facie case of racial discrimination. The plaintiff always has the burden of proving his case, *Burdine, supra*, 450 U.S. at 255, 101 S.Ct. 1089, at 1094, 67 L.Ed.2d 207, citing J. Wigmore, Evidence § 2489 (3rd ed. 1940) (The burden of persuasion "never shifts"). On the other hand, there may be valid reasons for imposing a heavier evidentiary burden on elected school authorities operating under a desegregation order than on private employers under Title VII. However, we do not decide this question of law, because we are satisfied that the defendant has offered sufficient evidence to carry this burden as well as the burden to create a genuine issue of fact.

Thus, it is our function to address the ultimate factual issue: Whether there was intentional discrimination *vel non* against the plaintiff in violation of his right to equal protection of the laws.

"On this issue, the plaintiff has the burden of persuasion, which [he] may meet 'either directly by persuading the court a discriminatory reason more likely moti-

vated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' In either case, the trier of fact must then determine which explanation, employer's or employee's, is more persuasive."

*Williams v. Southwestern Bell Telephone Co.,* 718 F.2d 715, 717–18 (5th Cir.1983).

Here plaintiff contends that the School Board has administered the teacher tenure laws in a discriminatory fashion; that the Board's decision to demote him was tainted by racial factors, because white principals received more favorable treatment in similar cases of misconduct; that the bringing of charges and the finding of guilt were a pretext to remove him as principal because he was black; and that his discharge was engineered to create a vacancy so that Freddie Banks could be restored to his former position as a principal.

 We find that plaintiff has dismally failed to establish that the Board was motivated by a discriminatory reason or that the Board's explanation of its demotion of the plaintiff was unworthy of credence. We find that the explanation of the defendant is clear and reasonably specific, see *Redditt v. Mississippi Extended Care Center,* 718 F.2d 1381 (5th Cir.1983), and it has met its burden of production. Plaintiff was properly demoted, having been found guilty of willful neglect of duty and incompetence: the removal of several students from the two classrooms to avoid their testing in violation of Board policy. Plaintiff has utterly failed to establish that white principals received more favorable treatment in similar cases of misconduct, or that the finding of guilt was a pretext to remove him because he was black, or that his discharge was engineered to create a vacancy for the appointment of Freddie Banks:

(1) The record reflects three instances of investigations initiated by the Board for misconduct by white principals. In these three cases, the white principals resigned rather than face formal charges and a hearing on their recommended dismissal.

(2) On another occasion a white principal was formally charged, hearing was had, and he was demoted to be assistant principal at Oak Hill High School.

(3) There is not one instance of disciplinary charges having been brought against any black principal prior to the charges in plaintiff's case.

(4) There is a complete absence of evidence establishing that any principal, including the plaintiff, was empowered to exempt, at his own discretion, any student or students from taking the test. Plaintiff did not produce one witness or principal who stated that he exercised or knew any other principal who exercised such power. On the contrary, we find from the letters issued by Ms. Boss, from testimony regarding the workshop, from the testimony of Mr. Gill, a white principal, the testimony of Mr. Christophe, a black principal, and from the covert manner in which plaintiff prevented several students in his school (who were present to take the test) from taking the test, that plaintiff knew that he had no such authority.

Considering the above, we find that the policy of the Board was that all children present on the day of testing were to be given the test; that plaintiff was well aware of this policy; and that he purposely and deliberately prevented students present on the day of testing from taking the test. There is no doubt that the rating of plaintiff's school would be improved by exempting poorer students from taking the test, thus improving plaintiff's record of performance.

Plaintiff's excuse that parents of these 7 or 8 absentees were given notice of the makeup examination is unconvincing. All of these students were present on the day of testing, and if Board policy had been followed, all of them would have been tested. In this case only two took the makeup examination.

(5) Plaintiff stated repeatedly at the hearing that he disagreed with the Board's policy of testing. At one point in his testimony he would deny that he removed the students; moments later he would state

that he would do it again because he did not agree with the policy. Plaintiff's attitude toward the Board was defiant and betrayed a complete lack of discipline or a sense of loyalty toward the Board or Board policy which would be expected of a principal.

(6) Plaintiff, in his defense and in an attempt to demonstrate discrimination, charged that a second grade student, Tiffany Hayes, had been promoted from the first grade in Martin Park Elementary and transferred to Lincoln Road Elementary without taking the mastery test. No charges had been brought by the Board against the white principal Mr. Gill for failure to administer the test to Tiffany Hayes. The only evidence available discloses that Tiffany Hayes did take the test and that the teacher and the school staff responsible for making the record could not explain its absence. There is not one iota of evidence that principal Gill knew of the error or had any part in the making of the error. Principal Gill testified that he knew the policy of the Board regarding the taking of the test and that it was enforced in Martin Park Elementary. In this case there was no evidence of any irregularity other than the misplacement of the record of the test. This could hardly constitute a case for charges against Mr. Gill and certainly has no similarity to the deliberate actions of plaintiff.

(7) After completion of the School Board hearing and prior to the hearing on this suit, the School Board brought charges against Mr. Charles Thigpen, a white principal at Rapides High School. See ¶ 23 above. The Thigpen investigation and charges bear little resemblance to the charges against plaintiff for preventing the testing of students. They are far more similar to the charges against plaintiff for misdirecting funds. The action of the principal in both cases involved a minor infraction which was motivated on behalf of the students without any selfish purpose. In both cases, the principal admitted the infraction. Thigpen, the white principal, received a reprimand. Plaintiff, the black principal, was acquitted.

(8) During the same period the Board, following its official criteria, rejected a number of white applicants and appointed a black applicant to replace Mr. Long, a white, as principal of Rosenthal Elementary School.

(9) Plaintiff was given an extensive hearing (public at his request) which commenced at 5:00 o'clock p.m. and continued through the early morning hours of the next day. He had every opportunity to call witnesses and produce evidence to defend himself against the charges. It is principally on the evidence at that hearing that we have come to our conclusions on this matter. Although he denied the Board's charges of excluding students from the taking of the test, he at other times declared his opposition to the policy and his "right" to violate it. Although he repeatedly charged the Board with discrimination against black principals, there is no testimony from any other black principal and not one other instance in the record to support such charges. We find that the Board correctly acquitted him of the admitted charge of misapplication of funds and found him guilty of the violation of School Board policy regarding the testing of students. Plaintiff has failed to show that the action of the Board, considering his actions and his attitude, was discriminatory.

## JUDGMENT

For written reasons this day assigned, it is

ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of the defendant, RAPIDES PARISH SCHOOL BOARD, and against plaintiff, ISAAC HAMMOND; that plaintiff take nothing by this suit and that the same be DISMISSED at his cost.