Genevieve AHIA, Plaintiff,

v.

HAWAII PROTECTIVE ASSOCIATION, LTD., Defendant.

Civ. No. 80–0623.

United States District Court,
D. Hawaii.

Dec. 12, 1984.

Meredith Lenell, Captain Cook, Hawaii, for plaintiff.

Christopher G. Pablo, Charles Khim, Honolulu, Hawaii, for defendant.

## MEMORANDUM OPINION

RAFEEDIE, District Judge.

This matter came on regularly for trial on December 4, 1984, the Honorable Edward Rafeedie, United States District Judge, sitting by designation in the District of Hawaii. Ms. Meredith Lenell appeared for plaintiff Genevieve Ahia. Mr. Charles Khim appeared for defendant Hawaii Protective Association (HPA). Having considered all competent evidence adduced at trial, as well as the arguments of counsel, the Court holds in favor of the plaintiff for the reasons enumerated herein.

## FACTUAL BACKGROUND

Plaintiff, a former employee of HPA, brought this action under § 703(a)(1) of the Civil Rights Act of 1964 (42 U.S.C. § 2000e–2(a)(1)), alleging that HPA discriminated against her on the basis of sex when it removed her from the night shift of her job as a security officer at Keahole Airport.

Before plaintiff went to work for HPA, she had been an armed airport security guard for Burns Security during 1975 and 1976, a job on which she had performed night patrol duties. When plaintiff began at HPA, she worked sixteen hours per week, all on the day shift. After making a request to her supervisor, Peter H. Kamanawa, for more hours, HPA put her on the night shift for two ten-hour shifts per week, thereby increasing her weekly hours from sixteen to thirty-six. Her duties on this shift included foot patrol through passenger areas of the terminal, as well as patrolling the airport parking lots and hangars by car. If plaintiff encountered an unauthorized person on the premises, it was her duty to detain them until police assistance could be summoned. Plaintiff performed this job unarmed.

On the night of February 25, 1978, after approximately five months on the night shift, plaintiff had an accident in her patrol vehicle. According to plaintiff's testimony, she swerved to avoid a dog and ran up over an embankment and onto a bicycle ramp, overturning the vehicle. That evening, she submitted a written report of the accident to Mr. Kamanawa. At the time of the accident, plaintiff was also working approximately thirty hours per week at a local department store.

A few days after the accident, Mr. Kamanawa informed plaintiff that she no longer would be working the night shift. According to plaintiff's testimony, Mr. Kamanawa told her that the reason for the change was that the Hilo office did not want women working nights because it was not safe. When plaintiff requested more information on the reduction in hours, Mr. Kamanawa stated that he had no say in the matter and that he did not believe the accident was the reason.

Plaintiff left HPA in December of 1978 to work as a patrol officer for the Hawaii County Police Department. She worked there until September of 1984, when she transferred to the State Liquor Control Division.

After HPA reduced her hours, plaintiff first contacted her union representative. Receiving no relief from the union, she then filed a sex discrimination complaint with the Hawaii Department of Labor. Robert Smith, an investigator for the department, interviewed HPA officials James K. Namahoe and Clyde Springer concerning plaintiff's complaint.

Plaintiff contends, based on the statements made to her by Mr. Kamanawa and the investigation by Mr. Smith, that HPA categorized all women as unqualified for night duty, regardless of any other qualifications. Plaintiff seeks damages in the amount of $3,822.00 for the reduction of pay caused by the decrease in her hours, as well as attorney's fees and costs.

HPA argues that there was no intentional discrimination. Its primary defense is that, after the accident in which plaintiff overturned the patrol vehicle, its client demanded that HPA move plaintiff off of night duty, and HPA did so to avoid losing its contract with the airport. HPA further contends that even if plaintiff's testimony is true, there exists no intentional discrimination because HPA's primary motivation was plaintiff's safety. In addition, HPA maintains that plaintiff did not sue within ninety days of notice of a right to sue, as required by § 706(f)(1) (42 U.S.C. § 2000e–5(f)(1)). Finally, HPA contends that plaintiff did not mitigate her damages.

## LEGAL DISCUSSION

*Standards of Proof in a § 703(a)(1) Discrimination Case*

■ In order to establish a prima facie case of sex discrimination under § 703(a)(1), plaintiff must prove by a preponderance of the evidence that she was qualified to work the night shift but HPA removed her under "circumstances which give rise to an inference of unlawful discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

If plaintiff is successful, she creates a rebuttable presumption of discrimination that HPA must overcome by producing evidence of legitimate non-discriminatory reasons which justify the treatment. To rebut this presumption, HPA must set forth, through admissible evidence, the reasons for the reduction in her hours, and the reasons must be legally sufficient to support a judgment for HPA. However, defendant does not have to persuade the Court that the proffered reasons actually motivated its actions. *Id.* at 254–55, 101 S.Ct. at 1094–95.

If HPA makes this showing, the factual inquiry proceeds to "a new level of specificity." *Id.* at 255, 101 S.Ct. at 1094. Plaintiff retains her burden of persuasion and has to prove that she has been the victim of intentional discrimination. She may prove discrimination directly by persuading the Court that "a discriminatory reason more likely motivated the employer" or indirectly by demonstrating that the employer's explanations are "unworthy of credence," i.e., pretextual. *Id.* at 256.

In *U.S. Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983), the court treated the intent inquiry as a question of whether "the employer ... treated[ed] some people less favorably than others because of their race, color, religion, sex, or national origin" (quoting *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)). This issue is an ultimate question of fact and depends largely on the credibility of the witnesses. As the Supreme Court has stated, "In short, the district court must decide which party's explanation of the employer's motivation it believes." *Aikens,* 103 S.Ct. at 1482.

### Application

As in many discrimination cases, this lawsuit comes down to whether the Court believes, based on the credibility of the witnesses at trial, that "a discriminatory reason more likely motivated" HPA or that HPA's explanations were pretextual.

*Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The Court reaches this issue because it finds that plaintiff has made out a prima facie case through her own and Mr. Smith's testimony that HPA reduced her hours primarily because she was a woman, even though her prior experience indicated she was qualified for the job. Establishing a prima facie case is not an onerous burden, and the evidence adduced at trial gives rise to "an inference of unlawful discrimination." *Id.* at 253, 101 S.Ct. at 1094.

Moreover, defendant has rebutted the presumption of discrimination by producing admissible evidence of legitimate reasons justifying plaintiff's removal from the night shift. The possible negligence surrounding plaintiff's accident and the fear of losing the contract with the airport constitute legitimate non-discriminatory reasons for reducing her hours.

Therefore, the crux of this case is "which party's explanation of the employer's motivation [the Court] believes." *Aikens,* 103 S.Ct. at 1482. In cases of this type, the Court often must give the most credence to the employer's first explanation for its actions. Such explanations are more likely to be true because there is less time for fabrication or embellishment.

The dilemma presented to the Court in this case is which, if any, of the employer's *three* explanations is worthy of belief. Mr. Kamanawa's statement to plaintiff cited concern for the safety of a woman working alone at a desolate facility as the sole reason for termination of night duty. After telling Mr. Smith that they were unaware until the accident that a woman was working nights, the major thrust of the explanations provided by Messrs. Namahoe and Springer was again concern for the plaintiff's safety, embellished by concerns over negligent operation of a motor vehicle, and the reactions of the airport manager. Thus, at the second opportunity to present an explanation, new reasons were added. Interestingly, however, Mr. Smith testified that he asked these two representatives "point blank," if plaintiff was removed be-

cause of the accident, and both denied it. Thus the stage for version three is set.

The in-court testimony of Mr. Namahoe is that he knew all along that plaintiff was working nights since he approved her assignment. The sole reason for the removal of plaintiff, he testified, was because the airport manager demanded it, and that was because the manager had come to the conclusion that plaintiff was guilty of negligently causing the accident. This witness emphatically told the Court that no other reason was involved in plaintiff's removal.

HPA's initial expression came through Mr. Kamanawa, who told plaintiff that the Hilo office had determined that it was not safe for women to work nights. When plaintiff questioned him further, Mr. Kamanawa responded that he did not believe the accident was the reason for her reduced hours.

The Court attaches significant weight to Mr. Kamanawa's statements because plaintiff's only contact with HPA was through him. Since Mr. Kamanawa did not make final personnel decisions, the Court must presume that he forwarded HPA's reasons. Moreover, the Court finds it strange that Mr. Kamanawa, who is still an HPA employee, did not testify in this case. The testimony of the plaintiff is thus uncontradicted with respect to what Mr. Kamanawa told her.

The testimony of Robert Smith further buttresses plaintiff's side of the case. Mr. Smith is a State Department of Labor investigator with no motivation to fabricate, and his testimony is supported by departmental records. He interviewed Mr. Namahoe and Mr. Springer, two officials designated by HPA and strongly motivated to place HPA in a favorable light regarding a possible discrimination action. In an interview coming sometime after Mr. Kamanawa's initial statements to plaintiffs, these officials said that plaintiff's accident was a "contributing factor" in the decision to move her. They also cited some work per-

formance complaints, set out safety concerns, and related the airport manager's desire that "this would not happen again."

Yet, even in this second expression of intent, the HPA officials declared that plaintiff was *not* removed because of the accident (although it was a "contributing factor"), that the airport at night was a "spooky place" for a female guard, that police needed thirty minutes to respond to calls in that area, that the airport guards had recommended having two armed "men" (meaning males), and that the accident had brought it to their attention for the first time that a woman was working nights. Thus, even when HPA had had some time to formulate a defense to a discrimination complaint, it still was setting forth reasons relating primarily to fears that a *woman* could not protect herself on the night shift.

Plaintiff's and Mr. Smith's testimony is in sharp contrast to that of Mr. Namahoe. Years after the incident, Mr. Namahoe's in-court version of the story differs markedly from what he evidently told Mr. Smith.[1] Mr. Namahoe now contends that he knew all along that plaintiff had been working nights and that the airport manager's dissatisfaction with plaintiff's level of competence led to the client's contractual demand that plaintiff be removed. Once again, however, if this story is true, it troubles the Court that the airport manager did not testify as to his demands. All the Court is left with are hearsay statements (unlike the admissions of party opponents Kamanawa, Namahoe, and Springer utilized by plaintiff) made by a person with an obvious motive to fabricate. Moreover, HPA produced no records documenting the reasons for the actions taken. The conflicting nature of HPA's verbal assertions and Mr. Namahoe's clear bias cast doubt on HPA's witness credibility.

■ Therefore, weighing all the evidence, the Court finds that plaintiff's ver-

---

1. Defendant's contention that Mr. Namahoe never had an interview with Mr. Smith borders on the ridiculous. It is too much to ask the Court to believe that Mr. Smith "imagined" the interview or somehow interviewed someone other than Mr. Namahoe by mistake.

sion of the facts is the more credible. HPA removed plaintiff from the night shift primarily because she was a woman. Although HPA had safety concerns, they were concerns rooted in a belief that a woman could not take care of herself on the night shift. This conclusion is consistent with both HPA's initial and secondary expressions of intent. While legitimate nondiscriminatory reasons may have existed for plaintiff's removal, the timing of HPA's reliance upon them permits the Court to infer that they were pretextual. Thus, the Court concludes that "a discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

 As for HPA's contention that plaintiff did not sue in a timely manner, the Court finds that plaintiff was not aware of her right to sue letter until sometime after her lawyer received a copy of the letter on October 9, 1980. Plaintiff testified that she was expecting the letter and looked for it diligently. She frequently called her attorney's office to ask if her attorney had received the letter. The ninety-day period in § 706(f)(1) runs from the time of receipt, not the time of dispatch. *Lynn v. Western Gillette, Inc.*, 564 F.2d 1282 (9th Cir.1977). Under the circumstances, it is clear to the Court that plaintiff did not "receive" the letter until after October 9. Therefore, her filing of suit on December 8, 1980 was timely.

HPA's final contention is that plaintiff failed to mitigate her damages. Section 706(g) (42 U.S.C. § 2000e–5(g)) provides in part: "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."

The burden is on the employer to show that the employee could have mitigated her damages. *Sangster v. United Air Lines, Inc.*, 633 F.2d 864, 868 (9th Cir. 1980). The employer must establish that there was "substantially equivalent" work available which, in the exercise of reason-

able diligence, the employee could have obtained. *Id.* at 868.

The Court finds that HPA has failed to meet its burden of showing a failure to mitigate and that plaintiff, under the circumstances, exercised reasonable diligence in obtaining other employment. Therefore, there is no reason to "reduce the back pay otherwise available." 42 U.S.C. § 2000e–5(g).

### CONCLUSION

For the foregoing reasons, the Court finds that HPA's removal of plaintiff from the night shift primarily on the basis of sex constitutes a violation of § 703(a)(1). Accordingly, the Court awards plaintiff damages of $3,822.00, an amount equal to the reduction in pay suffered by plaintiff as a result of working twenty less hours per week during her last ten months with HPA. The Court further directs plaintiff to notice a motion for attorney's fees and costs in this action in accordance with the Local Rules.