# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 04-1741

_____

| | | |
|---|---|---|
| Terry Tatum; Michelle Baptiste; | * | |
| Bilal Olushola; Mark Stewart; | * | |
| Chris Blair; Russ Hardy; | * | |
| Quentin Randolph; Henry | * | |
| Williams; Dwayne Pearson; | * | Appeal from the United States |
| Thomas Madison; Joseph McNeal, | * | District Court for the |
| | * | Eastern District of Missouri |
| Appellants, | * | |
| | * | |
| v. | * | |
| | * | |
| City of Berkeley, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: November 18, 2004
Filed: May 27, 2005

_____

Before RILEY, McMILLIAN and GRUENDER, Circuit Judges.

_____

McMILLIAN, Circuit Judge.

Seven African American individuals (collectively "plaintiffs"), all former or current firefighters with the City of Berkeley, Missouri ("the City"), appeal from a final judgment entered in the United States District Court[1] for the Eastern District of

---

[1]The Honorable Henry E. Autry, United States District Judge for the Eastern District of Missouri.

Missouri in favor of the City on their claims of racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e et seq., and intentional infliction of emotional distress under Missouri law. For reversal, plaintiffs argue that the district court erred in granting the City's motion for judgment as a matter of law ("JAML"), at the close of plaintiffs' presentation of evidence at trial, upon concluding that each plaintiff had failed to present legally sufficient evidence for the jury reasonably to find in his or her favor on each claim. For the reasons stated below, we affirm in part and reverse in part and remand the case to the district court for further proceedings consistent with this opinion.

Jurisdiction in the district court was proper based upon 28 U.S.C. §§ 1331, 1343, and 1367. Jurisdiction in this court is proper based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

**Background**

In September 2001, plaintiffs filed a charge of racial discrimination with the Equal Employment Opportunity Commission against the City. Thereafter, they brought the present action in federal court. The complaint was originally filed by ten plaintiffs, three of whom voluntarily dismissed their claims prior to trial. The remaining plaintiffs are: Terry Tatum, Michelle Battiest,[2] Bilal Olushola, Russell Hardy, Quinten Randolph, Dwayne Pearson, and Joseph McNeal. Count I of the first amended complaint alleged that plaintiffs were each subjected to racial discrimination and retaliation in violation of Title VII and 42 U.S.C. § 1981(a). Count II contained a supplemental claim under the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010 et seq. Count III alleged intentional infliction of emotional distress under Missouri law.

---

[2]The spelling of this name as it appears in the court's caption is consistent with the caption on plaintiffs' complaint.

The case proceeded to trial on February 23, 2004. Through their presentation of evidence, plaintiffs attempted to show that the City, primarily through the actions of Lloyd Vester, the former acting city manager and acting fire chief for the City, subjected each of them to racially-motivated adverse employment treatment. Numerous witnesses were called to the stand, including each of the seven plaintiffs, Lloyd Vester, and John Sczepanski, a white firefighter whom plaintiff Battiest had accused of racially-motivated workplace harassment. The City vigorously cross-examined each of the witnesses. After resting their case, plaintiffs voluntarily dismissed their MHRA claim.

The City moved for JAML on plaintiffs' remaining claims. The City argued that, as to the Title VII claims, there was no direct evidence, nor sufficient indirect evidence, of racial discrimination. The City maintained, for example, that plaintiffs failed to identify any similarly situated individual outside the protected group who had received more favorable treatment from the City. See Trial Transcript (Vol. IV) at 131-34. The City suggested that the evidence established the following facts beyond genuine dispute. Plaintiffs Tatum and McNeal were terminated as probationary employees of the City because they falsified their written employment applications, having each failed to disclose a prior arrest in response to a question specifically asking for such information. Plaintiffs Hardy and Randolph were terminated for testing positive for illegal drug use. Plaintiff Battiest, who alleged a racially hostile work environment based upon the City's failure to address her claims of harassment by Sczepanski, failed to identify an adverse employment action taken by the City or to show that the alleged harassment was motivated by race. Plaintiff Pearson was initially terminated but was fully restored to his employment with the City following a review by the Civil Service Board. Plaintiff Olushola, who alleged that someone had put fertilizer in his oxygen mask, could not show that the City failed to adequately investigate the matter. The City also argued that plaintiffs had not presented any evidence of damages.

In response, plaintiffs argued that they had each presented sufficient evidence at trial to survive the City's motion for JAML. Id. at 134-38. They maintain that the evidence sufficiently demonstrated the following facts. Regarding the racial discrimination claims of Tatum and McNeal, a similarly situated white probationary firefighter, Robert Laramie, was also terminated by the City for falsifying his application, but he was allowed to change his termination to a resignation. Kevin Post, a white firefighter who was hired by the City and attended a training program at the St. Louis County Fire Academy ("the Academy") around the same time as Tatum and McNeal, resigned from the City's employment while attending the Academy and yet he was allowed to continue using the City's "turnout gear"; by contrast, Tatum and McNeal were ordered to return the City's turnout gear immediately upon their terminations. The turnout gear was necessary to complete the training program. Moreover, prior to being hired, Tatum resolved the City's concerns about the suspended imposition of sentence ("SIS") on his record, which indicated that he had a prior arrest. Battiest was harassed by Sczepanski and suffered compensable emotional harm, regardless of the fact that she did not lose any pay or benefits. When she formally complained of the harassment, the City did not genuinely investigate her claims. Similarly, when Olushola reported that someone had put fertilizer in his face mask, the City's investigation was perfunctory and disingenuous. Randolph and Hardy, who were ostensibly terminated for illegal drug use, were nevertheless subjected to racially-motivated adverse treatment in the form of multiple drug tests.

In addition, plaintiffs asserted: "[T]he one thread running through all the complaints of harassment is that Lloyd Vester is the person who started it." Id. at 136. Summing up their theory about Vester's racial animus, plaintiffs contended:

> Lloyd Vester is fired by a black man, Arbon Hairston, for acting
> improperly with the city council. The city council hires Lloyd Vester as
> acting City manager; fires Arbon Hairston, the black man. Lloyd Vester,

-4-

first thing he does was . . . try to make it economically impossible for Tatum and McNeal to go to the academy. When that didn't work, . . .the next workday, he went ahead and started the process . . . re-ordered the background checks knowing that a public background check would not reveal what he wanted to see because he knew going in that there was a suspended imposition of sentence because he was on [Tatum's] oral boards the first time.

Lloyd Vester one month later fires Dwayne Pearson, two weeks later fires Tatum and McNeal. In the space of that time, two more African Americans quit. The man is unqualified for the job as was the testimony. He got into the job, and within 60 days . . . half the African Americans were gone, and the rest were complaining of harassment for which perfunctory investigations were done.

Id. at 137.

Upon consideration of the parties' arguments and the evidence presented at trial, the district court granted the City's motion for JAML. Regarding plaintiffs' Title VII claims, the district court explained that, for each plaintiff, "[t]he issue is whether the plaintiff has made a prima facie case such that a jury can be allowed to determine as to each individual plaintiff whether the circumstances that they complain of are the result of racial discrimination or racial bias, [and] whether there is any racial animus that is the basis for the damage that they claim individually." Id. at 141. The district court held, without elaboration, that the evidence supporting plaintiffs' Title VII claims was insufficient as a matter of law. The district court further held that plaintiffs failed as a matter of law to establish their claims of intentional infliction of emotional distress because proof of those claims depended upon proof of the Title VII claims and, in any event, the evidence was insufficient as a matter of law. Id. at 141-42. Thereafter, the district court entered judgment for the City, and plaintiffs timely appealed.

## Discussion

We review *de novo* the district court's decision to grant the City's motion for JAML. Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 906 (8th Cir. 2005). Rule 50(a) of the Federal Rules of Civil Procedure permits the district court to enter judgment against a party in a jury trial on a claim or defense that the party cannot maintain under the controlling law, so long as the party has been fully heard on the issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue. See Kinserlow v. CMI Corp., 217 F.3d 1021, 1025 (8th Cir. 2000) (quoting Fed. R. Civ. P. 50(a)). We apply the same legal standard as is applied for summary judgments. "In both Rule 56 motions for summary judgment and Rule 50 motions for judgment as a matter of law, the inquiry is the same: '[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id.; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (Reeves) ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'") (citations omitted). In ruling on a motion for JAML, the court should review all of the evidence in the record and draw all reasonable inferences in favor of the nonmoving party, without making credibility determinations or weighing the evidence. Reeves, 530 U.S. at 150.

*Title VII discrimination claims*

When Title VII claims of unlawful employment discrimination are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "[w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may

be considered on a motion for judgment as a matter of law." Reeves, 530 U.S. at 148-49. In the present case, the district court granted the City JAML upon concluding that each plaintiff had not sufficiently established his or her prima facie case.

If a plaintiff fails to establish a legally sufficient evidentiary basis for the jury reasonably to find just one element of his or her prima facie case, then JAML for the defendant may properly be granted. Cf. Erenberg v. Methodist Hosp., 357 F.3d 787, 793 (8th Cir. 2004) (holding that the district court properly granted summary judgment for the defendant where the plaintiff "did not prove a prima facie case of age discrimination, because she failed to show that she was qualified for the position from which she was discharged").

In McDonnell Douglas Corp. v. Green, 411 U.S. at 802, the Title VII prima facie burden was described as follows.

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority[3]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

The Supreme Court added, however, that, as a general proposition, "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." Id. at 802 n.13. Since then, the Supreme Court has repeatedly emphasized that "the precise requirements of a prima facie case can vary

---

[3]In the present case, there is no dispute that all seven plaintiffs are within a protected group and thus meet the first element of their respective prima facie cases.

depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)). Accordingly, we will consider whether the evidence supports the prima facie case for each individual plaintiff's Title VII discrimination claim.

We begin by considering Battiest's claim. Battiest asserted a hostile work environment theory based upon allegations that her coworker, Szcepanski, subjected her to racial harassment. See Brief for Appellant at 14-15 ("Michelle Battiest was forced to work in a hostile work environment with John Sczepanski after he assaulted her and Berkeley took no real action."). To establish her prima facie case of racial discrimination based on a hostile work environment, Battiest was required to show: (1) that she belongs to a protected group, (2) that she was subjected to unwelcome harassment, (3) that the harassment was based on race, (4) that the harassment affected a term, condition, or privilege of her employment, and (5) that the City knew or should have known of the harassment and failed to take proper remedial action. See Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1068 (8th Cir. 2005) (Title VII sexual harassment claim). Upon complete review of the evidence presented at trial, viewed in the light most favorable to Battiest, we hold that plaintiffs did not present a legally sufficient evidentiary basis on which the jury reasonably could have found that the harassment she alleged was based on race or that the alleged harassment affected a term, condition, or privilege of her employment. Accordingly, we hold that the district court did not err in granting JAML for the City on her Title VII discrimination claim.

Next we consider the claims of Hardy and Randolph, who were each terminated by the City after testing positive for illegal drug use. At trial, neither Hardy nor Randolph denied using illegal drugs. Nevertheless, on appeal, they maintain that the jury reasonably could have found that their terminations were motivated by race because they "were terminated under questionable circumstances and pursuant to

Lloyd Vester's implementation of the drug policy enacted under his watch." Brief for Appellants at 14.[4] To satisfy their prima facie burdens, Hardy and Randolph were each required to show: (1) that he belongs to a protected group, (2) that he was qualified to be a Berkeley firefighter, (3) that he was subjected to an adverse employment action, and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. See, e.g., Wheeler v. Aventis Pharms., 360 F.3d 853, 857 (8th Cir. 2004) (Wheeler). To the extent Hardy and Randolph rely on their respective terminations to show an adverse employment action, neither can overcome the City's facially legitimate reason for terminating them: their undisputed use of illegal drugs in violation of the City's zero-tolerance drug policy. To the extent they contend that the drug testing itself was an adverse employment action, plaintiffs have identified no evidence from which the jury reasonably could have concluded that the drug testing was conducted in a racially discriminatory manner. Accordingly, we hold that the district court did not err in granting JAML for the City on their Title VII discrimination claims.

Next we consider Olushola. He bases his unlawful employment discrimination claim on the assertion that he "was forced to resign when he could not get a loan from his pension." Brief for Appellants at 14. Because it is undisputed that Olushola voluntarily resigned in order to draw his pension, see Trial Transcript (Vol. I) at 131, his claim of racial discrimination rests upon a constructive discharge theory. "[C]onstructive discharge is but one incident by which an employee can demonstrate an adverse [employment] action." MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 928 (8th Cir. 2004). "A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation." Id.

---

[4]In the district court, plaintiffs argued that the racial discrimination claims of Hardy and Randolph were not based on their terminations but, rather, were based on the "multiple drug tests." See Trial Transcript (Vol. IV) at 138.

In the present case, Olushola testified that, prior to his resignation, he spoke with Police Sergeant Jim Bakula, the chairman of the pension board, and requested a loan from his pension account because of a family emergency; he added that he was willing to pay back the loan in whatever manner the pension board deemed appropriate. Trial Transcript (Vol. I) at 148-49. According to Olushola, Bakula's response was: "No. Can't do it." Olushola then asked him: "[H]ow am I able to get a loan against my pension?" Bakula responded: "You have to quit. You have to resign." Id. at 149. Bakula subsequently sent Olushola a written correspondence identifying a written provision which Bakula believed supported the denial of Olushola's loan request, but which Olushola interpreted as inapplicable to his situation. Id. at 150. At a meeting of the pension board, the board decided against granting Olushola a loan. Id. at 150-51. Thereafter, Olushola resigned. He testified that he was not aware of any employee of the City who was allowed to borrow money against his or her pension. Id. at 141, 151. Upon review, we hold that Olushola's testimony regarding his loan request does not reasonably support a finding that the City took any action with the intent to create an intolerable working environment in order to compel him to resign.

Because plaintiffs' recitation of the facts also emphasizes the incident in which someone allegedly put fertilizer in Olushola's face mask,[5] we now consider whether that evidence, when added to the evidence regarding the denial of his loan request, creates a legally sufficient basis for the jury reasonably to have found a constructive discharge. On cross-examination, Olushola acknowledged that no policy of the City permitted such malicious conduct, Trial Transcript (Vol. I) at 145, and further acknowledged that there was probably nothing the City could have done to prevent

---

[5]See Brief for Appellants at 3 ("Plaintiff Bilal Olushola had his breathing apparatus tampered with – someone put fertilizer in his breathing mask – a potentially life threatening occurrence. He complained, and the matter went up the chain of command. Supposedly, an investigation, nothing happened. White firefighters felt comfortable enough to so act because they were not punished for their actions.").

it. Id. at 147. Thus, upon viewing the record in its entirety, in the light most favorable to Olushola, we still conclude that the evidence could not reasonably support a finding that the City took any action with the intent to create an intolerable working environment, in order to compel Olushola to resign. Accordingly, we hold that the district court did not err in granting JAML for the City on Olushola's Title VII discrimination claim.[6]

Turning next to Pearson, we note that plaintiffs' entire argument on appeal regarding his Title VII discrimination claim is as follows:

> Lloyd Vester had racial animus against African American firefighters because Arbon Hairston, the African American City manager fired him. Lloyd Vester [was] appointed Acting City manager and Acting Fire Chief on August 19, 2001 and two weeks later fired Dwayne Pearson on August 26, 2001 [sic]. Dwayne Pearson ha[d] to go through the expense to hire an attorney to get his job back. Dwayne Pearson also received treatment for stress because of the situation at Berkeley.

Brief for Appellants at 15 (citations to the trial transcript omitted).

Contrary to plaintiffs' suggestion, the mere fact that an individual was terminated by a person of a racial minority and then subsequently terminated a different person of the same racial minority does *not* reasonably support an inference that the second termination was motivated by racial animus. In the present case, the evidence showed that the stated reason for Pearson's termination in August 2001 was

---

[6]Although Olushola does not assert a hostile work environment theory on appeal, one might be inferred from the evidence regarding the incident involving his face mask. In any event, Olushola could not establish the required prima facie elements because the jury could not reasonably have concluded from the evidence that the City should have anticipated the single incident or that the City failed to take proper remedial action once the matter was reported.

-11-

the accumulation of accidents involving his operation of fire department vehicles. Pearson conceded that he had three such accidents in 2000 and, as a result, was disciplined. See Trial Transcript (Vol. IV) at 114-15. In June of 2001, Pearson was involved in a fourth incident, in which he failed to fully retract a fire truck ladder before driving the truck into the firehouse. The error caused some damage to the ladder and to the overhead door of the firehouse and also affected a response to a call. Id. Vester testified that he made the decision to terminate Pearson after investigating the June 2001 incident. Id. (Vol. III) at 169-71.

Pearson appealed his termination to the Civil Service Board in September 2001, and the Civil Service Board reversed Pearson's termination and reinstated him without any loss of pay or rank. Id. (Vol. IV) at 125-26. There is no evidence that Pearson suffered any adverse employment action after his reinstatement. Thus, the only possible adverse employment action that the jury could have found was the August 2001 termination, which was later reversed. Upon consideration of the totality of evidence, viewed in the light most favorable to Pearson, we hold that the jury could not reasonably have concluded that the termination occurred under circumstances giving rise to an inference of racial discrimination. We therefore hold that the district court did not err in granting JAML for the City on Pearson's Title VII discrimination claim.

The two remaining plaintiffs are Tatum and McNeal, who were probationary firefighters when the City terminated them ostensibly for failing to reference prior arrests on the written employment application, notwithstanding a question specifically asking for information about any prior arrests. Tatum and McNeal maintain that the City's justification – falsification of their employment applications – was merely a pretext for racial discrimination. They claim that similarly situated white probationary firefighters were treated more favorably than they were.

To establish a prima facie case of racial discrimination based upon a disparate treatment theory, Tatum and McNeal were each required to show that he: (1) is in a protected group, (2) was qualified for the probationary firefighter position, (3) suffered an adverse employment action, and (4) was treated less favorably than a similarly situated employee outside the protected group. See, e.g., Tolen v. Ashcroft, 377 F.3d 879, 882 (8th Cir. 2004).

On appeal, Tatum and McNeal compare themselves to Kevin Post, a Caucasian probationary Berkeley firefighter with whom they attended the Academy's training program. Around the same time that Tatum and McNeal were terminated, Post resigned from his employment with the City. He was allowed to continue using the City's turnout gear and complete the training program, while Tatum and McNeal were ordered to return their turnout gear immediately upon their terminations. As a result, they were not able to complete the training program.

Although Post was similarly situated to Tatum and McNeal in some respects, he was not similarly situated to them in one material respect. Post had voluntarily resigned, whereas Tatum and McNeal had been terminated. We hold that the jury could not reasonably have concluded from the evidence that Post was similarly situated to Tatum and McNeal.

Tatum, alone, also suggests on appeal that Robert Laramie provides an example of disparate treatment. Brief for Appellants at 3 ("Lloyd Vester allowed Robert Laramie, a white male, who was terminated at the same time as Terry Tatum for the same reason, to change his termination to a resignation.").[7] Laramie, like Tatum, was

---

[7]McNeal does not make the same disparate treatment argument based upon Robert Laramie's resignation. It appears from McNeal's testimony that he was allowed to change his termination to a resignation. Trial Transcript (Vol. IV) at 93 (". . . I was allowed to change my status of being terminated or resigned."), 110-11 (testifying that he was terminated on October 2, 2001, was told of the termination on

terminated for falsifying his application. On direct examination, Vester recalled that a union representative had come to him requesting that Laramie's termination be changed to a resignation. Trial Transcript (Vol. III) at 163. Tatum testified that he received a letter from the local union offering to help negotiate with the City for his resignation, as opposed to termination, but he never responded to the union's letter. Id. (Vol. I) at 92, 105. There is no evidence that Tatum, himself, asked the City to change his termination to a resignation. Consequently, we hold that the jury could not reasonably have concluded from the evidence that the City treated Tatum less favorably than Laramie under similar circumstances.

We recognize that Tatum introduced additional evidence at trial regarding his personal experience in the hiring process to support the inference that Vester's reliance on Tatum's alleged falsification of his employment application was actually a pretext for racial discrimination. See Trial Transcript (Vol. I) at 79-82. Tatum testified that, after taking the City's written examination, he went before an oral interview panel which included: Henry Williams (African American), Jim Linhardt (Caucasian), Lloyd Vester (Caucasian), and Jane Albert-Morris (African American). After the interview, Albert-Morris, the City's human resources director at the time, telephoned Tatum and stated that he needed to come back in to discuss some issues that had come up during a background check. Tatum indicated to Albert-Morris on the telephone that he believed he knew what the issue was and would bring documentation to set the matter straight. Shortly thereafter, Tatum met with Albert-Morris in her office and then with Hairston, the city manager at the time, in his office. According to Tatum, Albert-Morris told him that his background check revealed an SIS, to which he responded that he had been told that the SIS would be removed from his record and would not have to be disclosed on an application. He produced documentation to support his explanation. Tatum further testified that, after also discussing the matter with Hairston, and showing Hairston the documentation,

October 3, 2001, and submitted his letter of resignation on October 4, 2001).

Hairston stated, in effect: "[T]his will suffice. And this will no longer be an issue." Id. at 82.

Although there is no evidence that Tatum ever spoke directly with Vester regarding the SIS at the time he was being interviewed and hired, Vester's integral role in Tatum's hiring process reasonably suggests that Vester became aware of the SIS and Hairston's verbal acceptance of Tatum's explanation. That conclusion does not necessarily prove that Vester was motivated by race when he later terminated Tatum, but it does reasonably support the inference that Vester's stated reason for terminating Tatum – falsification of the application – was not his true reason. The City presents no argument on appeal to dispel this inference, but merely continues to assert that Tatum was lawfully terminated for falsifying his application. See Brief for Appellee at 10-11. Viewing the evidence in the light most favorable to Tatum, we conclude that the circumstances of Tatum's termination reasonably give rise to the inference that Vester's stated reason for terminating him was a pretext for an unlawful employment decision – possibly one motivated by race. We thus conclude that Tatum presented sufficient evidence to establish a prima facie case, see Wheeler, 360 F.3d at 857 (setting forth prima facie case based upon circumstantial evidence giving rise to an inference of unlawful discrimination), and that the district court should not have granted the City's motion for JAML on Tatum's Title VII discrimination claim.

*Title VII retaliation claims*

We now turn to plaintiffs' Title VII retaliation claims. The following is plaintiffs' entire argument on appeal regarding the legal sufficiency of the evidence at trial to support these claims.

> In September 2001, all the African American firefighters at the City of Berkeley went to the EEOC to complain about the racial discrimination to Berkeley. See Tr., Vol. II, p. 95. Subsequently, they

all suffered the adverse employment actions described [in plaintiffs' brief on appeal]. The causal relation of the protected activity and the adverse employment action can be inferred from the temporal proximity of the protected activity and the adverse employment actions.

Brief for Appellants at 18.

It is well-established in this circuit that mere temporal proximity between an employee's protected activity and the employer's adverse employment treatment generally will not suffice to create a genuine issue of fact on a retaliation claim. See Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir.) (en banc), cert. denied, 528 U.S. 818 (1999) ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). In the present case, there is no evidentiary basis on which to make an exception to this general rule for any of the plaintiffs except Tatum. As discussed above, Tatum established a genuine issue of fact as to whether Vester's stated reason for terminating him was a pretext for an unlawful employment decision. Viewing the evidence in the light most favorable to Tatum, we conclude that the jury reasonably could have found that Vester's motivation was retaliatory. Accordingly, we affirm the district court's grant of JAML on each of the plaintiffs' retaliation claims, except for Tatum's.

*State law claim of intentional infliction of emotional distress*

Finally, we consider plaintiffs' state law claims of intentional infliction of emotional distress, upon which the district court also granted the City's motion for JAML. The essential elements of this claim required plaintiffs to prove that (1) the City's conduct was extreme and outrageous, (2) the City acted intentionally or recklessly, and (3) the City's conduct caused plaintiffs to suffer severe emotional distress. See Hendrix v. Wainwright Indus., 755 S.W.2d 411, 412 (Mo. Ct. App. 1988).

-16-

The following is plaintiffs' entire argument on appeal regarding the legal sufficiency of the evidence supporting their emotional distress claims.

> In this case, Plaintiffs have pleaded the aforementioned elements necessary to state a claim for the intentional infliction of emotional distress in Count III. Furthermore, Plaintiffs Russ Hardy, Michelle Battiest and Dwayne Pearson all testified that they received treatment for stress as a result of the problems at the City of Berkeley. Therefore, the [District] Court should not have granted the City of Berkeley [JAML] on the emotional distress claims.

Brief for Appellants at 19.

With the exception of Tatum, plaintiffs did not present legally sufficient evidence to establish an issue of fact as to whether the City's conduct was illegal, much less "extreme and outrageous." Cf. id. (where harassment of employee for filing a complaint was *illegal*, it nevertheless did not rise to the level of "extreme and outrageous" conduct). As to Tatum, even if we were to conclude that the evidence was legally sufficient to support a reasonable finding that the City's conduct toward him was extreme and outrageous, plaintiffs failed to present legally sufficient evidence from which the jury reasonably could have found that Tatum suffered severe emotional distress. Accordingly, we hold that the district court did not err in granting JAML on all of plaintiffs' claims of intentional infliction of emotional distress.

## Conclusion

For the reasons stated, we reverse the district court's grant of judgment as a matter of law for the City on Tatum's Title VII racial discrimination and retaliation claims. We affirm the judgment of the district court in all other respects. The case is remanded to the district court for further proceedings consistent with this opinion.

_____